THE CINCINNATI.

(District Court, E. D. New York. June 24, 1899.)

1. COLLISION — FERRYBOAT NAVIGATING IN FOG—SPEED—NEW YORK HARBOR.
   It is the duty of a double-screw ferryboat, which is unable to steer under slow headway, operating in a fog, when known to be approaching a pier, where the presence of another vessel may reasonably be expected, to be under such control, as to speed, that she can stop in time to avoid a collision after approaching near enough, so that the other vessel, if present, can be seen.

2. SAME—FAULT OF INJURED VESSEL—LYING AT END OF PIER.
   The provision of the Greater New York charter making it unlawful for vessels to lie at the outer end of wharves on the North or East river, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier, does not relieve a ferryboat from liability for col-lision with another vessel tied up at the end of a pier during a fog, where the ferryboat was attempting to find its own slip, which was not adjacent to such pier.

In Admiralty.   Libel for collision.

Wilcox, Adams & Green, for libelant.

Robinson, Biddle & Ward, for claimant.

THOMAS, District Judge.   At about 8 o'clock a. m., on the 5th day of November, 1898, the libelant's steamboat William Fletcher, after lying at pier 14, North river, overnight, started down the river for the purpose of reporting at the Battery.   A dense fog had delayed her departure, but it lifted sufficiently to justify navigation.   However, she proceeded down the river to the neighborhood of the slips of the Pennsylvania Railroad Company, when the fog again closed in and compelled the tug to turn about, and, her previous position having been occupied by another vessel, she tied up at the end of pier 13, known as "Starin's Pier."   The first slip south from such pier was Starin's slip, while the first and second slips below Starin's slip were those of the Pennsylvania Railroad Company, into which the claimant's ferryboat Cincinnati was seeking to enter when she collided with the Fletcher lying at the end of pier 13, as above stated.   The Cincinnati left Jersey City at 7:48 a. m., and, as the fog was exceedingly dense, decreased her speed to about two-thirds of her usual speed.   Before sighting the Fletcher the Cincinnati had shut off her steam, and was going through the water under the momentum theretofore acquired. She discovered the Fletcher when about 50 feet away from her, that being the distance at which the lookouts on the vessels could see objects.   The Cincinnati had maintained usual and proper signals during her passage.   The bow of the Cincinnati struck the end of the shaft of the Fletcher.   This indicates that the course of the ferryboat was approximately at right angles to the face of the pier.   There is a single doubt concerning the liability of the Cincinnati.   She had been going at something over half speed, probably at about two-thirds her usual speed.   Her master states that he rang a slow bell, because he "was getting far enough over to New York then to slow in a fog," although he could not see anything.   Thereafter he stopped his engines, because, as he states, "it was time to begin to look for the slips and docks in New York."   The bell on Starin's pier No. 13 was ringing, and the pilot of the tug heard and was governing himself by it, and thereby he states that he knew that he "was pretty straight on and off" Starin's dock.   The tide was slightly ebb, and the master testified:

"On an ebb tide we consider we are pretty close to the slip when we are a little above, and we are apt to work in and find the end of the dock or corner of the dock."

It also appears that the pilot in clear weather sought to leave the lower corner of pier 13, by some 30 or 40 feet, in the condition of tide then existing, and that the pilot of the Cincinnati knew that boats often lay at the end of the pier, and that he might expect to find one at such place.   As soon as the ferryboat saw the Fletcher, her engines were reversed and everything possible was done to prevent the accident.   The sole question is, was the Cincinnati approaching the New York shore under too great headway?   The headway, although

not considerable in itself, was such that the ferryboat could not·be stopped after seeing the other boat. Must a ferryboat operating in a fog be under such speed in approaching a pier that it can be stopped after discovering and before colliding with a boat at a pier? The inquiry is one of importance. It will be observed that the headway of the ferryboat was so slow that, according to her master, she would not steer. This was due to her having double screws. Hence there was but a single means of averting collision, and that was by proceeding so slowly through the water that the boat could be stopped before striking an object discovered ahead; that is, the boat should be under control as to speed. That seems to be a conclusion sound in logic and highly useful in practice, and the failure to observe it in the case at bar puts the ferryboat in fault. Unless such be the rule, vessels that will not steer under slow headway are excused from liability. It may be that the headway was inconsiderable; but when, from the construction of the vessel, the rudder has become useless, the headway should be diminished so as to be controllable when approaching a pier, where the presence of another vessel is expected. For it must be remembered that the master of the Cincinnati knew that he was off his course, that he was near pier 13, and that a boat might be expected to be lying at the end of the pier. Why, then, should he approach the pier in a dense fog, with a momentum that he could not check sufficiently to avert a collision? But it is urged that the Fletcher was also in fault. It is thought that she gave signals pursuant to her duty in that regard. But does she fall within the statute prohibiting vessels from lying at the end of piers? The statute is a part of the Greater New York charter, and is as follows:

"It shall not be lawful for any vessel, canalboat, barge, lighter or tug to obstruct the waters of the harbor by lying at the exterior end of wharves in the waters of the North or East river, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier; and any vessel, canalboat, barge, lighter or tug so lying shall not be entitled to claim or demand damages for any injury caused by any vessel entering or leaving any adjacent pier." Laws 1897, c. 16, § 879.

The Cincinnati was not "entering or leaving any adjacent dock or pier." The Fletcher was obstructing Starin's slip to the south, but the Cincinnati was not seeking to enter that slip, and her entrance thereto was not anticipated, nor had she any right therein. The statute undoubtedly intends to prevent the use of piers forming the boundaries of slips to or from which another vessel seeks entrance or exit. A vessel in passage may not rake a ship lying at the end of a pier in the river, and exculpate itself from responding therefor upon the ground that it was making its way in a fog and trying to find and enter its proper slip, and that the injured ship was at the end of the pier, in violation of the statute. A broader view of the statute than that here adopted is inconsistent with its words and spirit, and incompatible with the necessities of the port, which the legislature may be presumed to have considered. A decree should be entered for the libelant, with costs.