## WRIGHT & COBB LIGHTERAGE CO. v. NEW ENGLAND NAVIGATION CO. et al.

(District Court, S. D. New York. July 18, 1911.)

1. COLLISION (§ 96*)—VESSEL LYING AT END OF PIER—HARBOR REGULATIONS.
    New York City Charter (Laws 1901, c. 466) § 879, which provides that it shall not be lawful for any vessel to lie at the exterior end of wharves in the waters of the North or East Rivers, "except at their own risk of injury from vessels entering or leaving any adjoining dock or pier," does not make such mooring illegal, nor does it have any application to a case

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of collision between a boat lying at the end of a pier and a moving vessel not entering or leaving an adjoining slip.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 203, 204; Dec. Dig. § 96.*]

2. SHIPPING (§ 54*)—CHARTERS—LIABILITY FOR INJURY TO VESSEL—MOORING AT END OF PIER.

The mooring of a barge for the night outside of another at the end of a pier in East River, while waiting an opportunity to enter the adjoining slip, which was then full, to load from a vessel therein, was not negligence, and a charterer by a demise of the barge cannot be held liable to the owner for her injury by another vessel which came into collision with her while lying in such position.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. § 54.*]

3. COLLISION (§ 100*)—MOORED VESSEL AND FERRYBOAT—NAVIGATION OF FERRYBOAT IN FOG.

A ferryboat is not negligent for navigating in a fog, and one crossing East River in the early morning in a fog so dense that other vessels could be seen but a very short distance was not in fault for a collision with a car float alongside a tug, which was moored with two others off the end of a pier, and against which the ferryboat was drifted by the tide while waiting a clear entrance to her slip, where she was in all respects carefully navigated and had a lookout properly stationed, but who could not see nor hear the tug and float until too late to prevent the collision.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 213–215; Dec. Dig. § 100.*]

4. COLLISION (§ 100*)—LIABILITY OF VESSELS—NEGLIGENT MOORING.

Three companion tugs each with a car float on either side, caught in a sudden fog about midnight in East River, made fast side by side at the end of a pier; the flotilla extending out into the river about 315 feet. Held that, under the circumstances, it not appearing that any better place was available, such action was not negligent.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 100.*]

5. COLLISION (§ 100*)—MOVING AND MOORED VESSELS—FOG SIGNALS BY MOORED VESSEL.

There is no rule requiring vessels moored to a pier to ring a bell in a fog, and a failure to do so is not negligence which renders the vessel liable for a collision with a moving vessel.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 100.*]

6. COLLISION (§ 100*)—FOG—INEVITABLE ACCIDENT.

A collision in East River in the early morning in a dense fog, by which a moored barge was struck and injured by a car float in tow which had been broken from its mooring with the tug by collision with a ferryboat, held a result of inevitable accidents, for which none of the vessels was in fault.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 100.*]

In Admiralty. Suit for collision by the Wright & Cobb Lighterage Company against the New England Navigation Company, in which the Union Ferry Company and the New York, New Haven & Hartford Railroad Company were brought in under the rule. Libel dismissed.

Foley, Martin & Nelson (Mr. Martin, of counsel), for libelant.

Charles M. Sheafe, Jr. (James T. Kilbreth, of counsel), for New England Navigation Co. and another.

James J. Macklin, for Union Ferry Co.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HOLT, District Judge. This suit is brought by the Wright & Cobb Lighterage Company to recover damages for a collision on January 22, 1909, between the barge Howard J. Vail, owned by the libelant, and a car float owned by the New York, New Haven & Hartford Railroad Company. The barge at that time was under a charter from the libelant to the respondent the New England Navigation Company. The charter was a demise of the bare boat, the charterer furnishing the crew and supplies, and having the entire control of the barge. On the afternoon of the day before the collision, the barge was taken by a tug of the New England Navigation Company to Pier 15, East River, the pier of the Mallory Line. She was to be loaded from a steamer there. The slips on each side of the pier were entirely occupied by other vessels, and the captain of the tug moved the barge outside another barge at the end of the pier. There was a light fog on the river that night until about midnight. Then the fog became very thick, and so continued till morning. That night three tugs of the New York, New Haven & Hartford Railroad Company, each towing two car floats loaded with cars, going from Oak Point to Greenville, arrived near Pier 5, East River, about midnight, when the fog became dense, and the three tugs with their floats thereupon moored off the end of Pier 5. The first tug, No. 20, was moored to the pier, the next, 14, was moored to 20, and the outside one, 19, was moored to 14. 20 was headed up the river; 14 and 19 down the river. 14 and her floats were a little farther up the river than the other two. About 5:45 o'clock the next morning the ferryboat Pierrepont of the Hamilton Ferry line, owned by the Union Ferry Company, started from Hamilton avenue, Brooklyn, with several hundred passengers, on the first of her regular trips that day to the foot of Whitehall street, New York. The night was dark and the fog very dense. There was a strong flood tide. The Pierrepont proceeded at slow speed, sounding fog signals. The captain was at the wheel. With him in the wheelhouse was a man acting as a lookout, and another lookout was stationed forward outside the gates. A South Ferry boat, going also from Brooklyn to Whitehall street, was ahead of the Pierrepont all the way across, blowing fog signals, and, after the Pierrepont had proceeded part of the way across, fog signals from a Staten Island ferryboat coming in to her berth were also heard. The ferry racks of the South Ferry and Hamilton Ferry in New York adjoin each other, and it is necessary that a South Ferry boat ahead of a Hamilton Ferry boat should completely enter her berth before the Hamilton Ferry boat attempts to enter. The Pierrepont, therefore, when she had proceeded part way across the river, stopped and waited for the usual signal from the South Ferry boat that she had entered her slip. There was a delay of some minutes. The Staten Island ferryboat, in entering her slip, which adjoins the Hamilton slip on the south, got in the way of the South Ferry boat, and prevented it from landing for a time. At length, the captain of the Pierrepont heard the signal from the South Ferry boat that she had reached her slip, and gave an order to the engineer to go forward slowly. The engine had made only a few turns when the lookout forward of the

gates saw a light off the starboard bow, and immediately notified the captain. The fog was so dense that the captain at first could not see the light, but he immediately ordered the engines reversed. Immediately after he saw the light, which was on the outside car float of tug 19, and was not more than 50 feet away. The flood tide was carrying the Pierrepont down upon the car float, and the captain, seeing that a collision was inevitable, stopped backing. Immediately after a collision occurred. The corner of the forward car on the outer side of the car float crashed into the steamer's cabin about 20 feet abaft the wheel, and the deck of the car float, running under the guard of the ferryboat, broke a section of the paddle wheel, the force of the blow throwing the front part of the car off the rails. The collision caused much excitement among the passengers, some of whom, jumped off upon the adjacent car float, and either because most of the passengers came to the side of the ferryboat next to the car float, or for some other reason, the ferryboat's guard, which overlapped the float's deck, stuck fast, so that for a number of minutes the ferryboat and the car float were fast together. The collision broke the set of lines nearest to the Battery fastening the inside float attached to tug 20 to the end of the pier. Thereupon the whole flotilla floated out, under the influence of the flood tide, until the other set of lines fastening the inner float to the pier parted. At the same time the lines beween 20 and 14 either parted, or were thrown off. This left 14 and 19 fast together, and the pilot of 19 asked the pilot of 14 to cast off the lines between them and move forward and push the Pierrepont away so as to separate it from his car float. The pilot of 14 did so, and succeeded in pushing the Pierrepont free from the car float to which it was first attached; but in doing so one of the car floats of tug 14 went under the guard of the ferryboat farther forward, breaking one of the rudder chains of the ferryboat, and became fastened to the ferryboat in the same way that the float of No. 19 had previously been fastened. Thereupon tug 14, with its two car floats, and the Pierrepont fastened to one of them, drifted with the flood tide up the river. At some time the Pierrepont became detached from the car float. The evidence is conflicting as to when that time was. Some witnesses assert that she became detached from the car float very quickly after she had become fastened; others that she remained fastened until after the car float came into collision with the barge Vail. I think from all the evidence that the Pierrepont got separated from the car float shortly before or about the time of the collision. At all events, one of the car floats attached to No. 14 came in collision with the Vail, lying moored at the end of Pier 15, as they were floating up on the tide. So long as the Pierrepont was fast to the front of the car float, tug 14 could not practically navigate or control the flotilla, and I am satisfied that the collision with the Vail took place before tug 14 had obtained any practical control of the navigation of the car floats.

The original libel was filed by the Wright & Cobb Lighterage Company, owners of the barge Vail, against the New England Navigation Company, as charterer, on the theory that the charterer was bound to return the barge in good order at the expiration of the charter.

Thereupon the New England Navigation Company, under the fifty-ninth rule, brought in by petition the Union Ferry Company as owner of the Pierrepont, alleging that the Pierrepont was in fault. Thereupon the Union Ferry Company brought in the New York, New Haven & Hartford Railroad Company, under the fifty-ninth rule, as owner of the three tugs and the accompanying car floats, alleging that the tugs or some of them were at fault for the collision.

[1] The first question in the case is whether the original respondent, the New England Navigation Company, was at fault. The barge was moored at the end of Pier 15 at the time of the collision, and therefore no fault of navigation can be imputed to it. The single question is whether it was negligence to moor the barge at the end of Pier 15. It is claimed in the first place that such mooring was a violation of section 879 of the New York City charter, which is as follows:

"It shall not be lawful for any vessel, canalboat, barge, lighter, or tug to obstruct the waters of the harbor by lying at the exterior end of wharves in the waters of the North or East River, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier; and any vessel, canalboat, barge, lighter or tug so lying shall not be entitled to claim or demand damages for any injury caused by any vessel entering or leaving any adjacent pier."

It has always been the custom in New York Harbor for vessels to moor for temporary purposes at the ends of piers as well as at the sides (The Mary Powell [C. C.] 36 Fed. 598; The Dean Richmond, 107 Fed. 1001, 47 C. C. A. 138); and, while any vessel so moored is obviously in a somewhat more dangerous position than if moored in a slip, it never has been held, so far as I am aware, to be illegal or a fault in navigation for a vessel to moor at the end of a slip. This statute obviously does not make it illegal. It simply provides that, if a vessel does lie at the exterior end of a wharf in the North or East River, it shall be at its own risk of injury from vessels entering or leaving any adjacent dock or pier. This statute does not make a vessel moored at the exterior end of a pier take the risk of injury from collision with a vessel which is not entering an adjacent dock or pier. This has been expressly held in various cases. The Cincinnati (D. C.) 95 Fed. 302; The Dean Richmond, 107 Fed. 1001, 47 C. C. A. 138; The Chauncey M. Depew, 139 Fed. 236, 71 C. C. A. 362. The car float that came into collision with the Vail was not attempting to enter any adjacent pier, and therefore the statute has no application.

[2] Nor can I see that there was any legal negligence in mooring the Vail outside the other barge at the end of Pier 15. She was brought there light to be loaded from a steamer lying in the slip. The slips on both sides of the pier were completely filled with other vessels. The weather at the time she was moored there was not unusual. There was no dense fog until midnight that night. She was moored at the end of the pier temporarily until a place in the slip could be obtained for her to be loaded. In my opinion, under these circumstances, it was not negligent to moor her for the night at the end of the slip. The result is that there can be no recovery in this case against the New England Navigation Company. Such a charterer is

not an insurer. It is not responsible for injuries to a vessel which it has chartered unless such injuries were caused by its own negligence.

[3] I cannot see that the Pierrepont was guilty of any fault. Ferryboats cannot tie up in a fog. Public interests require that they should make their regular trips even in very thick fogs. On this trip the Pierrepont was navigated carefully and prudently. The captain, a licensed pilot of long experience, was at the wheel. He had a lookout with him in the wheelhouse, and another on deck forward of the gates. He proceeded slowly, sounding fog signals. He had to stop till the South Ferry boat landed. He knew substantially where he was. He could hear the big bell rung in fogs off the ferry entrance. He did not know of the New Haven car floats moored off Pier 5. This was the first trip of his boat since about midnight. If the car floats had not been there, he would have had water enough. The fog was so dense that the light on the float could not be seen until it was so near that a collision could not be avoided. No one on the Pierrepont heard any bell on the New Haven tug. I think it doubtful whether any was rung. If rung, it was admittedly a small bell, and was not heard. In short, I see no ground for any charge of fault in the Pierrepont. The masters of New York ferryboats are generally experienced pilots, and careful, faithful men, who have surprisingly few collisions in view of the crowded condition of the harbor. They have to run in fogs; and there is no justice in holding them responsible for collisions in thick fogs, when they have done their best.

[4] The question whether the New York, New Haven & Hartford Railroad Company should be held responsible in this case because its tugs and car floats moored at the foot of Pier 5 is one upon which I have felt much doubt. These car floats are 41 feet, and the tugs 26 feet wide. Each tug and its two floats, therefore, together had a width of more than 100 feet. Three of these tugs and the accompanying floats were moored off Pier 5, making a projection of that pier, consisting of 9 vessels moored side by side, extending about 315 feet into the river. The place where these vessels were moored is one of the most crowded parts of the harbor. Pier 5 is but a little way above the Battery. Vessels are passing there all the time. Three ferry racks, into and from which ferryboats are constantly going, are immediately below Pier 4, and, in fact, there are few more congested waterways in the world than that part of New York Harbor. There is therefore much plausibility in the charge that it was negligent to moor these tugs and floats there, and especially for the captain of tug 19 to moor there after two other tugs and floats had already tied up off that pier. But, on the other hand, as already stated in respect to the Vail, it is not illegal or unusual, in New York, especially in a sudden exigency, to moor vessels temporarily at the end of piers. In this case the fog became dense suddenly. It was the duty of the captains to moor somewhere, and they had to act quickly. It is claimed that they should not have all moored off the same pier. But there is no evidence that other piers were not occupied, and, if they were, these long floats, 315 feet in length, could probably be moored more securely to each other than they could to shorter boats lying at the end

of piers. These flotillas, made up of a tug and two car floats, which project on each side far beyond the bow of the tug, constitute an unwieldy body, difficult to navigate anywhere, and particularly difficult to put into a slip quickly. The captains of the New Haven tugs were all licensed pilots, of long experience and good reputation. They were called on to act promptly, and there is nothing to show that they did not use their best judgment in the course which they took. Under all the circumstances, my conclusion, with some hesitation, is that they were not negligent in mooring off Pier 5.

[5] A claim also is made that they did not give any notice to the Pierrepont of their presence. They give evidence that a bell was rung that morning on tug 19. All the witnesses from the Pierrepont testified that they did not hear it, and I think it doubtful whether it was rung. But there is no rule that I am aware of requiring a bell to be rung by a vessel moored to a pier. A bell must be rung by a vessel at anchor, but these tugs and floats were not at anchor. They claim that a bell was rung. Their lights were burning; and I do not see that they did anything or omitted to do anything which it was their legal duty to do or to omit.

[6] Moreover it is a question whether, if they were guilty of negligence, the injury to the Vail from the collision 10 piers up the river can be considered the proximate result of such negligence. No demand is made in this case for a recovery for the injuries to the Pierrepont. The sole recovery sought is for the injuries to the Vail. But it is unnecessary to pass upon the question of proximate or remote result, for I think that, in view of all the circumstances, the injury which the Vail sustained was not the result of any negligence by anybody, but was the result of a series of inevitable accidents.

There should be a decree for the respondents, dismissing the libel, but, under all the circumstances of the case, without costs to any party.