## THE ALLEMANNIA.

(District Court, S. D. New York.  April 12, 1915.)

1. WHARVES ☞10—USE OF WHARVES—STATUTORY PROVISIONS—"EXTERIOR END"—"ADJACENT DOCK OR PIER."

Greater New York Charter (Laws 1901, c. 466) § 879, provides that it shall not be lawful for any vessel, canal boat, etc., to obstruct the waters of the harbor by lying at the exterior end of wharves in the North or East River, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier. *Held*, that a car float attached to the south side of Pier 7 in the East River, near the end of the pier, and swing-

ing out into the river beyond the end of the pier, was tied to the "exterior end" thereof, within the statute, while the south side of such pier and the south side of Pier 8 were piers adjacent to the north side of Pier 7, within the statute.

[Ed. Note.—For other cases, see Wharves, Cent. Dig. § 10; Dec. Dig. ☞10.]

2. COLLISION ☞70—LIABILITY—APPLICABILITY OF STATE LAWS.
　　While the admiralty jurisdiction is not affected by the penalty prescribed by Greater New York Charter, § 879, relative to tying up to the exterior end of wharves, the conduct of a particular vessel may well be determined by reference to the local statute.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 91–100; Dec. Dig. ☞70.]

3. COLLISION ☞72—LIABILITY—BOTH VESSELS AT FAULT.
　　A tug towing a car float was directed not to tie up on the north side of Pier 7 in East River, and as the south side of such pier and the north side of Pier 6 were crowded, the float was tied near the end of the south side of Pier 7, thus swinging out into the river and extending about to the southerly side of Pier 6 at a distance of about 80 feet therefrom. Outside of Pier 6 a steam tug was lying and taking water from a city hydrant. A vessel bound for the north side of Pier 7, because of her speed, the tidal conditions, and inadequate tug assistance, collided with the car float, damaging it, and causing it to swing against the tug at Pier 6. Held that, in view of Greater New York Charter, § 879, both the car float and such vessel were at fault, and the case as between them was one for half damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. 102; Dec. Dig. ☞72.]

4. COLLISION ☞71—LIABILITY—VESSELS AT REST—ADJACENT DOCK OR PIER.
　　The tug at Pier 6 was not at an adjacent dock or pier, not far enough out to be an obstruction to the navigation of the vessel, but was at the pier for a legitimate and necessary purpose, and was free from fault, and was entitled to half damages and half costs against the owners of the vessel and car float.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig. ☞71.]

In Admiralty. Libels by Jerry Petrie against the steamship Allemannia, the Hamburg-American Line, claimant, and another, and the Erie Railroad Company against the steamship Allemannia, her owners, etc. Decreed in accordance with the opinion.

Herbert Green, of New York City, for libelants and respondent Erie R. Co.

Haight, Sandford & Smith, of New York City (Henry M. Hewitt, of New York City, of counsel), for claimant.

MAYER, District Judge. On June 30, 1913, the steam tug Nanuet, belonging to the Erie Railroad, towed Erie car float No. 18 from New Jersey to Pier 7, East River. On the float were 10 cars, some empty, some loaded. The tug and tow arrived at the north side of Pier 7 about 6:35 a. m., and it was intended to tie up at the innermost berth, marked on Exhibit 1 as "Erie L." The captain of the Nanuet was informed by his mate that some one (presumably in authority) on the Erie Pier 7 had told him not to remain there, and the captain there-

upon, at about 7:20 or 7:30 a. m., proceeded to the slip between Piers 6 and 7.

The north side of Pier 7 was free, but the south side of Pier 7 and the north side of Pier 6 were crowded, so that the captain could not take the float in. The result was that the float (215 feet long) was tied to a "nigger head" near the end of the south side of Pier 7, and thus the float swung out into the river, completely obstructing the slip between Pier 6 and Pier 7 (which was 155 feet wide) and extending about to the southerly side of Pier 6; the distance between the end or face of Pier 6 and the offside of the float being about 80 feet.

A lighter was lying outside of Pier 6, and partly outside of this lighter was the steam tug Henry D. McCord, which had been moored at the northerly side of Pier 6, and which was taking water (or "crotoning," as Capt. Farrell called it) from the city hydrant at the end of the pier. The positions of the various craft are very well shown on the rough diagram Exhibit 1:

The Allemannia, a passenger and freight vessel of the Hamburg-American Line, was bound for Pier 7 under her own steam for the purpose of docking in the slip between Piers 7 and 8. At about 8 to 8:10 a. m. the collision occurred which is here the subject-matter of controversy.

On the evidence the theory of the libelants is that the Allemannia was proceeding at an excessive rate of speed and without the assistance of tugs, with the result that proper allowance was not made for the action on her of the tide (which was strong ebb) and for the presence of the vessels lying off Pier 7, so that she hit the car float and the car float swung in against the McCord, to the damage of both the car float and the McCord.

The theory of claimant, as disclosed in a so-called stipulation setting forth what the captain of the Allemannia would have testified if called (he being now abroad and unavailable), is as follows:

"When abreast of Pier 7, Pilot Kramer, who was in command, bore towards the corner of Pier 7, with the Allemannia going against the tide, and, when the steamship's bow had reached about the north corner of the pier, the engines were stopped and the stern of the vessel was caught by the swift-running ebb tide and swung in towards shore, where the stern came in contact with the Erie car float made fast to the south corner of the pier. The car float was shoved over toward the tug, made fast to the lighter on the end of Pier 6; but the contact was very slight, and I did not think that any damage had been done. The steamship started to go ahead again, in order to make her berth, when the car float, which was hanging loosely to the pier by one line, came sailing after her. This was no doubt due to the suction caused by the screw. Immediately the steamship's engines were stopped, and, as it was impossible to move the screw of the steamer until the car float was removed,

I had the tug Palmer hailed, and asked those in charge of her to keep the car float away from my stern."

As to the facts, I am satisfied from the testimony of Capt. Slater, that the tug Crescent made fast to the starboard bow of the Allemannia at about Pier 4 or 5; but, in view of the conflict of testimony, I am not satisfied that any other tug assisted up to the time the Allemannia reached Pier 7. This conclusion is borne out by the assertion in paragraph 6 of the answers:

"When the Allemannia *arrived off the pier*, two tugs were made fast to her starboard side to assist her in docking, and her port bow was placed against the north side of Pier 7."

The accident happened, in my opinion, because at the speed at which the Allemannia was approaching Pier 7, and in view of the tidal conditions and the inadequate tug assistance, the Allemannia could not be controlled sufficiently well to clear the car float and thus avoid the comparatively slight impact which caused the damage. I doubt whether whistles were blown; but, even so, that would not have helped.

On the other hand, the Allemannia had the right to believe that her course would not be impeded by (as to her) an unlawful obstruction. The captain of the Erie tug saw people waiting on Pier 7, and frankly admitted that he realized a ship was coming in, although he did not know at what time.

He did not make any inquiry, and therefore, for all he knew, the ship might come along at any time. Neither he nor the unnamed Erie Railroad authority on the pier made any effort to arrange for a safe berth on the north side of Pier 7, and the tying up of the float seems to have been merely a matter of greater convenience, easily rendered unnecessary, or probably so, if any effort had been made to avoid potential danger from swinging the car float off the south side when there was apparently plenty of room on the north south of Pier 7.

Claimant seeks to defeat recovery by libelants because of the New York statute, which reads as follows:

Laws N. Y. 124th Session, 1901, vol. 3, p. 375, § 879: "It shall not be lawful for any vessel, canal boat, barge, lighter or tug to obstruct the waters of the harbor by lying at the exterior end of wharves in the waters of the North or East River, except at their own risk of injury from vessels entering or leaving any adjacent dock or pier; any vessel, canal boat, barge, lighter or tug so lying shall not be entitled to claim or demand damages for any injury caused by any vessel entering or leaving any adjacent pier."

This statute has occasioned considerable discussion. The Cincinnati (D. C.) 95 Fed. 302; The Dean Richmond, 107 Fed. 1001, 47 C. C. A. 138; The Chauncey M. Depew, 139 Fed. 236, 71 C. C. A. 362; The Rosedale (D. C.) 141 Fed. 1001; Wright & Co. v. New England Navigation Co. (D. C.) 189 Fed. 809, affirmed 204 Fed. 762, 125 C. C. A. 129. The case most helpful on the facts here under consideration is The Chauncey M. Depew, supra. Judge Lacombe in that case pointed out that in previous cases the colliding vessel was not bound either in or out of an "immediately adjacent slip." He continued:

"Although broad language is used in the second clause of the section, we are not prepared to attribute to the Legislature any attempt to regulate procedure in the federal courts. * * * All that was intended was a prohibi-

tion against prosecuting the claim or demand for injury, caused by a moving vessel, in the courts of the state. Whether the conduct of a particular vessel has been rightful or wrongful may well be determined by reference to the local statute. * * * The Deyo lay at the end of the pier in flagrant violation of the terms of this statute. * * * She occupied water which * * * was required in order to allow the Sharon to be warped around the corner of the pier. * * * She was lying where she had no right to lie, increasing the difficulties of all boats trying to enter or leave the adjacent slips, and was herself at fault. Moreover, her fault contributed to the collision, whichever way it came about."

[1] It is necessary to determine for the purposes of this case the meaning of "exterior end of wharves" and "entering or leaving any adjacent dock or pier."

"Exterior end" cannot mean only the face of the pier between *a* and *b* in the above diagram, so as to refer only to boats projecting out from the line *a, b*. If a boat is tied to *c,* so as to swing out into the river to a point *d* beyond the prolongated line of *a* and *b* (dotted), such tying up is surely within the prohibition of the statute. If that were not so, then in the case at bar, as applied to a vessel entering the slip between Piers 6 and 7, the statute would have been inapplicable, even though the float completely blocked up the entrance to the slip, and such a construction of the statute would be so technically narrow as to defeat its very purpose.

As to the next point, the wording is "adjacent dock or pier." That means, in my opinion, that when the Allemannia was bound in for the north side of Pier 7, the south side of Pier 7 and the south side of Pier 8 were "adjacent" piers.

If this car float had stretched 200 feet out in the river from *b* to *e,* it would have obstructed the navigation of many craft which, to make their berth on the upper end of the pier *a, f,* must turn or warp around *a.*

[2] I think the statute (although inaptly worded) deserves support in the interest of safe navigation in a crowded port. It prohibits obstructing the waters of the North and East Rivers, and while the admiralty jurisdiction is not affected by the penalty prescribed by the statute, the conduct of a particular vessel "may well be determined by reference to the local statute." The Chauncey M. Depew, supra; Cornell Steam Co. v. Phœnix Cons. Co., 233 U. S. 593, 34 Sup. Ct. 701, 58 L. Ed. 1107.

[3] Holding the views expressed, I am of opinion that both the Allemannia and the car float were at fault, and that the case, as between them, is one for half damages.

[4] As to the McCord: This tug was not at an "adjacent dock or pier," nor was she out far enough to be an obstruction to the navigation of the Allemannia. She was at Pier 6 for a legitimate and necessary purpose, and was free from fault.

The McCord may have the usual decree for half damages and half costs against claimant and respondent.