THE STELLA.

THE VAUBAN.

(District Court, E. D. New York. April 26, 1917.)

1. COLLISION ⊙⟹115—VESSEL IN TOW—TUG MASTER ACTING AS PILOT.
   The fact that the master of a tug, in charge of the towing and docking of a ship, also acts as her pilot, to comply with the statute requiring her to have a pilot on board, and is paid therefor, does not render the ship liable for those operations which are exclusively the actions of the towing agent.
   [Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247.]

2. ADMIRALTY ⊙⟹79—SUIT FOR BREACH OF CHARTER—EFFECT OF JOINDER OF TORT-FEASORS.
   Where the owner of a chartered boat, injured in collision, in a suit against the charterer for breach of charter in failing to return the boat in good condition, also joins the vessel or others alleged to be in fault for the collision, the tort issues between libelant and the third parties were to be first tried; the charterer being liable only in case the damages cannot be recovered from the tort-feasors.
   [Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 592–594.]

3. SHIPPING ⊙⟹54—CHARTER—LIABILITY OF CHARTERER FOR INJURY TO BOAT IN COLLISION.
   The charterer of a barge with her master for lighterage service left her temporarily at the end of a pier until she could discharge her load to a vessel in an adjoining slip, which was then filled with other lighters discharging. Three days later, after the slip had been cleared, so that her master could have her moved around inside, but while she still remained at the end of the pier, she was injured by collision with a vessel entering the next slip. *Held*, that the charterer could not be charged with negligence in so leaving her, which would render him liable to the owner for her injury.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 78.]

4. SHIPPING ⊙⟹62—CHARTER OF BARGE AND MASTER—LIABILITY FOR ACTS OF MASTER.
   The master of a barge, employed by the owner and who goes with her when chartered, as between the owner and charterer, represents the owner in certain things, although the charter is a demise.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. § 83.]

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5.** COLLISION ☞72(2)—VESSEL LYING AT END OF PIER—MUTUAL FAULT.

A barge in charge of a master had been for three days lying at the end of a pier, with her bow extending in front of an adjoining slip, contrary to the provisions of section 879 of the Greater New York Charter, which made her liable to damages by a vessel entering the adjoining slip. Her master was notified to move out of the way to allow the entrance of a steamship into the slip, and was also signaled by the tugs in charge of the approaching vessel; but he made no move, and the barge was struck and injured by the entering ship. *Held*, that the barge was in fault, but, on the evidence, that the tugs were also negligent, and liable for half her damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 244–247.]

In Admiralty. Suit by William S. Bartley, as owner of the boat Stella, against Frederick B. Dalzell, W. Freeland Dalzell, the Merritt & Chapman Derrick & Wrecking Company, and the steamship Vauban. Decree for libelant for part damages against Dalzell & Co.

Foley & Martin, of New York City, for libelant.

Haight, Sandford & Smith, of New York City, for F. B. and W. F. Dalzell.

Van Iderstine, Duncan & Barker, of New York City, for Merritt & Chapman Derrick & Wrecking Co.

Burlingham, Montgomery & Beecher, of New York City, for the Vauban.

CHATFIELD, District Judge. The libelant chartered the scow Stella to the Merritt & Chapman Derrick & Wrecking Company for ordinary lighterage service, upon oral request over the telephone, on or about the 29th day of October, 1915. The Merritt & Chapman Company took the Stella into their possession at Fifty-Fourth street in the North River, and the master or captain of the Stella, who was on board at the time and was hired by the libelant, went along with the boat. She was loaded with a cargo of machinery or engines for a steamer lying upon the north side of Pier 10, on the Brooklyn side of the East River.

Upon arriving in the East River, it appeared that the slip between Piers 9 and 10 was filled with boats delivering cargo to this steamer, and the Merritt & Chapman Company tug left the Stella at the outer end of Pier 9. This occurred upon Friday, October 29th, and the Stella remained at the end of this pier until Tuesday morning, November 2d. In the meantime she had had no opportunity to deliver her cargo to the steamship, and on the morning of November 2d, the captain of the Stella was told by the superintendent of the company in control of Pier 9, to drop his boat around the end of the pier and inside the slip, as information had been received that a steamer was to be docked in the slip between Piers 8 and 9. The captain did not see fit to follow this instruction, and at about 11 o'clock on that day the steamer Vauban appeared, proceeding through Buttermilk Channel and up the East River in control of four tugs.

The officers of the Vauban were on board and her captain was upon the bridge, but she was not under her own steam, and a captain from

one of the tugs was also upon the bridge, from which point he directed the towing and docking of the vessel. This operation was being done by contract with the firm of Frederick B. Dalzell & Co., who owned the four tugs in question. Of these the witnesses all agree that the C. P. Raymond (whose captain had been upon the bridge and in charge of the fleet as the boats came up through the Buttermilk Channel) was immediately under the port quarter of the Vauban, with her bow toward the side of the steamer. The W. F. Dalzell was immediately under the starboard quarter of the Vauban and with her bow toward the side of the vessel. The Fred B. Dalzell had a line from her stern to a cleat upon the port bow of the Vauban, and was towing upon this line, throughout the period which will be described later, at an angle of about 45 degrees to port from the line of the steamer's keel. The Dalzelline had a line from her stern to a cleat upon the port side of the steamer near the stern, and was pulling at an angle of about 135 degrees from the line of the keel, or nearly at right angles to the tow line of the Fred B. Dalzell.

[1] When the captain of the Raymond left the bridge of the Vauban, his place was taken by the captain of the W. F. Dalzell, who not only directed the subsequent operations, but received a fee of $5 from the captain of the Vauban, who thus complied with the statutes requiring the presence of a pilot upon the bridge of the steamer while navigating inland waters. The performance of this double function by the captain in charge of the towing and docking operations and his presence as pilot for the steamer does not render the steamer liable for those operations which were exclusively the actions of the towing agent. The steamer and its officers (as distinguished from the tug's) appear to have been guilty of no negligence. The captain of the C. P. Raymond left the bridge and went to his own tug, for the obvious reason that, as the steamer went into her pier with her port side along the dock, the Raymond would be the first tug to leave the vessel. Her captain therefore turned the control of operations over to the captain of the tug upon the opposite side of the vessel, who could remain in position until the operation was completed. No difference in responsibility arises from this change in command.

The facts show that all the way from Pier 30 up to Pier 10 an exceedingly strong wind was blowing. The Fred B. Dalzell and the Dalzelline were both holding the vessel away from the piers, and the Dalzelline was actually being dragged stern foremost. One of the captains stated that she was used as a sort of sea anchor. But, inasmuch as the dragging force was the wind, it is evident that the Dalzelline directed her course into the wind, instead of being dragged directly astern of the Vauban. When off Pier 10, various parties observed the Stella lying on the head of Pier 9, and with her bow projecting a few feet into the slip between Piers 8 and 9. The captains of the four tugs testify that they began a continuous blowing of alarm whistles, in the form of short toots, for the space of 20 minutes, in order to attract the attention of the Stella's captain and to cause him to move his boat. No fire boat or police boat or fleet of salvage tugs answered this prolonged alarm, and whatever may have been the duration of the operation, apparently every one in sight or hearing ascertained that the

blowing had to do with the docking of the boat, and no outside persons joined in observation of the occurrence.

According to the captains of the four tugs, a tremendous squall or wind of hurricane force bore down upon the Vauban at this time from the west. They all agree that this wind forced the Vauban steadily over, in spite of the efforts of the four tugs, until the Vauban brought up on the forward port corner of the Stella, at a point just aft of amidships on the starboard side of the steamer. These witnesses testified that the Vauban had been taken up the river by the tugs to a point where her bow was opposite Pier 8, and was actually carried back by this west wind, so that her bow swung clear of Pier 8 and into the slip, where she was placed in her berth along the southerly side of Pier 8, without injury to the steamer.

Pier 8, East River, on the Brooklyn side, is nearly opposite Fulton Market in New York, and the offices of the Dalzell Company are on the New York side of the East River at a point where a full view could be had of the occurrence on the Brooklyn shore. While the steamer was in contact with the Stella, Mr. Dalzell, who had just come into his office, observed her position and the difficulties caused by the heavy wind against which the tugs were struggling with the vessel. He went downstairs and sent another tug, the Guiding Star, which arrived in time to help place the Vauban at her dock. But Mr. Dalzell did not hear the whistling and did not see the movements of the vessel prior to the time when she came in contact with the Stella.

The servants of the company which occupied Pier 8, and to which the Vauban was consigned, had cleared the steamer's berth earlier in the day, and one of them had gone over to Pier 9 and gotten the captain of the Stella out of his cabin in order to tell him to make way for the Vauban. This witness testifies that the captain of the Stella appeared to be intoxicated. At any rate, the captain of the Stella, who testified that he was a teetotaler, even though his appearance in court would cast suspicion upon that claim, made some profane answer and went back into his cabin, where he apparently remained, and ignored or did not hear the whistles of the fleet of tugs, and was brought to a realization of the presence of the Vauban by the blow of the collision, which knocked him over, laid open his head, and would of itself be sufficient to account for his dazed condition from that time on. He evidently took no part in the movement of the steamer into the slip, but remained upon his vessel until she was towed away and ultimately taken to a dock for repairs. He has remained as captain of the vessel until a few days previous to the trial, and no explanation was given by either side as to the manner of his leaving that employment, nor as to the condition in which he appeared in court.

[2] The libelant brought his action against the Merritt & Chapman Company, as charterers, alleging a breach of their obligation to return the vessel in good order, except for reasonable wear and tear. The libelant included as respondent also the firm of Fred B. Dalzell & Co. charging them with a tort arising from their alleged negligent towing of the vessel. The libelant further made the steamer Vauban a party defendant, charging it with tort, upon allegations of responsibility for the collision.

It has often happened that an action by a boat owner against the charterer for alleged breach of contract results in a trial of a cause of action for tort, presented by the joinder of the alleged tort-feasors, under the fifty-ninth rule, upon the petition of the respondent. In some cases the libelant alleges, at the outset, the commission of a tort by a third party, for which, as surety or guarantor, the respondent is charged to be liable for a breach of the charter, and of his duty as charterer to return the boat in good order. In such cases the tort-feasors are treated as agents of the charterer, who is thereby charged with responsibility for the tort and alleged to be liable in contract therefor. But in, the present action the libelant has alleged a cause of action in contract against the charterer and causes of action in tort against the alleged tort-feasors, who were outside parties, in no sense agents, and with no privity of contract or business relation with the charterer. The libelant has thus brought action on contract against the charterer, with whom he had the contractual relation, and has also alleged negligence against third parties, who might be brought in by the charterer under the fifty-ninth rule. In so doing he seeks to unite an action upon implied contract (as where there is an express agreement to return the boat in good order) with an action for tort. He thus unites the principal in the tort action (the alleged tort-feasor) with the charterer, who could be called upon only in case the tort-feasor fails to make good the damage caused by his own negligence. The libelant, while seeming to sue the charterer directly, has in reality named the charterer as a proper party, rather than one who is necessary to the maintenance of the tort action, and the issues of negligence must be tried out between the libelant and the third parties. The relations of the parties do not show any liability on the part of the charterer, Merritt & Chapman Company, for the consequences of any of the acts of the Dalzell Company or the Vauban, and the Merritt & Chapman Company could be held, therefore, in this case only if no negligence is shown on the part of the Dalzell Company or the Vauban. The libelant seeks, by a sort of subrogation, to stand in the shoes of the Merritt & Chapman Company with respect to an act of negligence to property in the custody of the Merritt & Chapman Company at the time.

[3] But it is also alleged that the Merritt & Chapman Company were guilty of some negligence in transporting the boat to the berth at the end of Pier 9 and of leaving her moored in that position, contrary to the provisions of section 879 of the Charter of the City of New York. Inasmuch as the boat was left there temporarily, in order to be at the disposal of other persons, and in order that the captain of the barge could put his boat at the disposal of the steamer when this was desired, it is impossible to hold that the Merritt & Chapman Company are liable for the consequences of a situation arising three days later, and after the slip had been cleared, so that the barge could have been carried around out of danger into the end of the slip. Wright & Cobb v. New England Navigation Co. (D. C.) 189 Fed. 809, affirmed 204 Fed. 762, 125 C. C. A. 129.

[4] But the act of the scow's captain in leaving her after warning, and after sufficient opportunity to take her from the end of the pier,

raises a question of another nature. In the first place, while the scow may have been demised (that is, completely surrendered to the charterer for the purposes of the charter, except in so far as the master of the scow represented the owner in looking after those matters which cannot be delegated from the owner to the charterer), such an oral charter does not make the captain the agent of the charterer in all respects, nor would a formal written charter, with the covenant to return in good order, make the captain of the scow the servant of the charterer in these matters. He was the servant or agent of the owner (that is, the libelant) in keeping the boat afloat, handling her lines, observing the method and amount of loading, and maintaining her in positions where she would not be endangered by matters which could be prevented through his activities. In so far as these very duties might concern the use of the scow, he would also be the agent of the charterer, but as between the owner and the charterer his authority is that of the owner. If, therefore, the captain of the Stella was intoxicated, or refused to observe obvious precautions, and if he neglected to look out for his master's property at a time when danger was apparent and imminent, and when care on his part would have protected the property, there would be reason for holding that his negligence would affect the right of the libelant to recover.

But beyond this is the proposition presented by the statute just referred to. The word "adjacent" means lying next to or adjoining. An "adjacent pier" to any particular pier must mean the next pier; that is, the pier on either side of the adjacent slip. The statute says that, if a boat is lying at a wharf, it shall be liable for damages by a vessel entering an adjacent dock or pier. As was said in the case cited, this does not make it illegal to lie at the end of a pier, nor can a vessel be held responsible for a collision out in a river with a boat which is not entering the adjacent slip.

[5] But in this case the Stella was certainly lying at a pier head (that is, a wharf) adjacent or next to the pier for which the Vauban was intended. Her captain was bound to recognize the danger of a large vessel entering that slip, particularly as the Stella projected several feet into the slip. We have, therefore, the situation of a vessel illegally maintaining a berth, where she received injury from the very matter prohibited by the statute. The Stella, therefore, was liable for the consequences of her own fault; but this did not absolve the Vauban, and the tugs which were handling the Vauban, from avoiding negligence on their own part.

The court finds from the testimony that the Dalzell tugs undertook to move the steamer up river at a time when, for the entire voyage, the wind was blowing at the rate of from 50 to 55 miles an hour. If the tugs were able to handle the Vauban on the voyage up the river, they could have proceeded further with the steamer in case it proved dangerous to enter the slip. The strong and sudden squall from the west caused the maneuver in question: but, according to the oral testimony and diagram made by the Dalzell captains, the direction from which they claim this squall came would have been the northwest. A west wind, as was inadvertently stated by the captain of the Raymond,

would blow against the port quarter of the Vauban, and not against her port bow, as would be necessary to drive her in the direction claimed by the witnesses. This leads the court to conclude that the wind did not overcome the control of the tugs, until they appreciated the fact that the Stella was not going to move, and until they decided, as the steamer gradually drifted in, to go ahead and to place the Vauban into the slip, without further loss of time and without waiting until a tug could be sent to move the Stella for them. The strong wind made it much more convenient to proceed at once into the slip, and as the captain of the Stella seemed to need to be aroused, and the Stella evidently was disregardful of the rights of the Vauban and of her own liability for damage by a boat entering the slip where the Vauban was going, the Dalzell tugs took the matter into their own hands and disciplined the Stella, but were evidently negligent in failing to avoid the infliction of unnecessary damage in so doing.

The libelant may have a decree for half damages against the owners of the Dalzell tugs. Inasmuch as the pilot on the Vauban did not interfere or prevent the maneuver, no costs will be awarded the Vauban, but the libel against the Vauban will be dismissed. The libel against the Merritt & Chapman Company will be dismissed, with costs.