### THE DANIEL McALLISTER.

(District Court, E. D. New York. July 31, 1917.)

1. COLLISION ⬤⟞95(1)—DRIFTING VESSEL—LIABILITY OF VESSEL ATTEMPTING RESCUE.

  If a drifting boat, which needs rescuing, cannot be stopped and brought to a mooring without involving some damage to other vessels, merely from the force of her momentum, actionable fault cannot be charged to a rescuing boat, which apparently used due care and did the proper thing to prevent greater loss.

2. COLLISION ⬤⟞8—VESSELS LYING AT PIER END—CONSTRUCTION OF STATUTE.

  Under section 879 of the Greater New York Charter (Laws 1901, c. 466), which prohibits boats from lying across pier ends in the North and

East Rivers, and makes them responsible for damages inflicted by boats entering or leaving adjacent slips, the responsibility of a boat so lying outside is just that responsibility which is the result of the place in which it is moored, and its distance in or out, as governed by boats lying between it and the pier end, does not enter into the situation.

3. COLLISION ⚖➔71(2)—TUG LEAVING SLIP WITH TOW—BOATS MOORED AT END OF PIER.

A barge, when being moved by a tug out from a slip in East River in a strong flood tide, was carried against other boats lying at the end of the pier above, breaking them from their moorings and causing them to drift against other boats further up, one of which, besides the barge in tow, was injured. It was in the daytime, and the position of the boats and condition of the tide were known to the master of the tug. *Held*, that the tug was in fault for failing to make proper allowance for such conditions; that the boats at the end of the pier were not liable, as with proper care on the part of the tug the collision would not have occurred.

4. COLLISION ⚖➔8—VESSELS LYING AT END OF PIER—CONSTRUCTION OF STATUTE.

The mere presence of a boat lying off the end of a pier, in violation of such provision, is not of itself negligence, creating responsibility for damage to another vessel; but, to be actionable, it must be accompanied by other circumstances, such as darkness, with no lights shown, or the creation of an obstacle in the water needed for navigation by any craft using proper care in its own movements.

In Admiralty. Suits for collision by John D. Lohman, owner of the barge Lohman, and by Charles H. Castle, owner of the steam canal boat Haines, against the steam tug Daniel McAllister. Decrees for libelants.

Foley & Martin, of New York City (James A. Martin and George V. A. McCloskey, both of New York City, of counsel), for libelants.

Hyland & Zabriskie, of New York City, for the Daniel McAllister.

Macklin, Brown & Purdy, of New York City (William F. Purdy, of New York City, of counsel), for the Kaaterskill No. 2.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones, of New York City, of counsel), for the Clayton and New York Cent. R. Co.

Charles M. Sheafe, Jr., of New York City, for New York, N. H. & H. R. Co.

Herbert Green, of New York City, for Erie R. Co.

CHATFIELD, District Judge. This action arose from a progressive series of incidents which nearly swept the river front of shipping from the Manhattan Bridge northward on the New York side for a space of 12 to 14 piers. One action is brought by the owner of the Lohman, which was lying in the slip between Piers 31 and 32, and which during the strong flood tide was taken out by the tug McAllister in order to be placed at a berth a short distance up the river. The captain of the McAllister intended to perform this maneuver by snubbing around the outer end of Pier 31, or by holding his tug against the tide until the barge, which was on a short hawser, had swung clear of the pier of the Manhattan Bridge, which stands in the northerly side of this slip and also of the line of piling which stretches down around

the outer side of the bridge pier, and against which boats are moored on the outer or river side. The space inside the bridge pier is used for the anchorage of fishing boats, and a serious dispute has arisen as to whether the Lohman had been lying against the bulkhead or along the north side of Pier 31. But this is entirely immaterial to the case.

Four canal boats had been moored abreast, off the end of Pier 32. The Kaaterskill No. 2 was outside, with the Clayton next to her, the Erie Railroad boat next, and a Lehigh Valley boat on the end of the pier. Four boats were also moored abreast, off Pier 33, with the Sedge outside, the Newark and Niagara (two New York Central boats) next, and a Baltimore & Ohio boat inside. At least two more boats were moored off the end of Pier 36, while the Haines, a steam canal boat, was moored across the end of a car float, which was lying on the upper or north side of Pier 41. This car float projected a little into the river, and on the south side of Pier 41 was another car float, the stern of which was about even with the outer end of the pier.

The captain of the McAllister was unable to execute the maneuver he undertook in just the form he intended, for before the Lohman swung around, so as to lie straight up the river, the tide carried the McAllister upstream, and the Lohman came in contact with one of the barges lying off Pier 32. The testimony indicates that this was the Clayton, or the third boat out from the pier. This collision further hampered the McAllister in controlling the Lohman, and the four barges off Pier 32 were swept away from the pier. At some point the lines between the Clayton and the Erie barge broke loose, and at Pier 33 the four boats off the end of that pier joined the fleet.

While off Pier 36 the two boats there moored were also carried away. The piers from 39 to 42 are used by the New Haven Railroad, and Transfers Nos. 7 and 9, which were lying at the New Haven piers, went out to give assistance and to rescue the boats floating upstream. This was done without damage to the various boats adrift, excepting the Lohman. Most of the boats were placed in at different piers south of Pier 41; but the Clayton and Kaaterskill, still fastened together and with the barge Lohman and the tug McAllister still in collision or close at hand, approached Pier 41 in such a position that Transfer No. 9 attempted to push them in to a point where they could get a line to the docks. According to the captain of the Haines, the Kaaterskill and the Clayton had swung around, so that the Kaaterskill was the inside boat; but these two boats were finally moored at Pier 43, with the Clayton still the inside boat, and the testimony of the witnesses upon the No. 9 is convincing to the effect that it was the Clayton, and not the Kaaterskill, which came in contact with the Haines.

It would appear that, while the No. 9 was getting these boats inshore, the Clayton came in contact with the side of the Haines, and the Lohman got under the bow of the Kaaterskill or Clayton. At just about the same time the McAllister, which had swung alongside the Lohman, attempted to push her ashore against the southeasterly corner of Pier 41 and across the forward corner of the Haines, which was then partly down across the end of Pier 41. The combined weight of the boats caused some damage to the side of the Haines. The Lohman was then pulled forward, so as to be moored to the car float

at the south side of Pier 41, and was later taken back and put in the berth near Pier 34, where she was to go when the occurrence started.

The second action involved has been brought by the owner of the Haines for the injuries received by his boat. He alleges fault on the part of the Daniel McAllister, both as a primary cause for the disaster and also for the way in which the McAllister landed the Lohman, when the Lohman was pushed into the corner of Pier 41. But the captain of the Haines has also brought in the New York, New Haven & Hartford Railroad, charging that it placed the Haines at the point where it received injury, that Transfer No. 9 was unable to check the drift of the boats, and that she was negligent in the way she attempted to land the boats, thus allowing them to bump against the side of the Haines. The owner of the Haines was so positive in his testimony and so certain as to the position of the boats as to throw doubt upon the accuracy of his observation when collision was impending, although there was no question that he was sincere in his statements. The evidence of all the parties bearing on this situation contradicts him, and he makes out no case at all of any negligence on the part of the No. 9.

[1] To charge a boat which is seeking to make a rescue with fault for failure to overcome conditions which she is not strong enough to resist would be to improperly locate the proximate cause of the damage, and merely to penalize the boat which physically was for the moment in charge of those movements which were attempted, as distinguished from the overpowering force of the drifting boats and the question of responsibility for their position.

Nor was there any evidence in the case, so far as the occurrence off Pier 41 is concerned, indicating that the McAllister was guilty of additional negligence in the method which was used to stop the drift of the Lohman and to prevent further destruction. If a drifting boat, that needs rescuing, cannot be stopped and brought to a mooring without involving some damage merely from the force of her momentum, it is impossible to find actionable fault in the efforts of a rescuing boat, which apparently used care and did the proper thing to prevent greater loss. It is a mere coincidence that the McAllister is the same boat against which fault was charged for the beginning of this catastrophe.

The McAllister has sought to bring in the barges lying at the outer end of Pier 32, so as to charge them with responsibility, not only for the injuries to the Lohman, but by alleging that fault in lying off the end of a pier head was the proximate cause of the injuries to the Haines.

The Kaaterskill denies any responsibility on her own part, and alleges the fault to be that of the McAllister or of the New York Central Railroad Company, which was the charterer of the boat Kaaterskill at the time, and had moored her at the place named, through one of its own tugs. The New York Central Railroad Company denies that it was in charge of the boat Kaaterskill, and also denies that it was at fault for the collision because of the presence of either the Kaaterskill or the Clayton during the occurrence which has been described.

The Erie Railroad Company denies any fault, and alleges that the four boats off the end of Pier 32 had been moved down shortly be-

fore this occurrence by a steam lighter, the Graylock, which had to unload at the end of Pier 32. According to this testimony the four boats were at the time of accident partially across the front of the rack outside of the bridge pier, and hence allowing less room for the use of the McAllister in letting the Lohman swing out into the river. The Erie Railroad denies any responsibility for the position in which the boat was left, and maintains that all four boats had been moved to the south through orders of the man in charge of the pier. The Erie Railroad, however, goes on to allege that the entire fault for the collision was that of the McAllister in bringing out the Lohman in the manner described.

A suggestion has been made that the inside boats of the four at the pier end were more liable, or should be held primarily liable, instead of those lying outside, inasmuch as the outside boats could have moved nearer shore, if the inside boats had not been present.

[2] This case involves application of the provision of the city charter (section 879) which forbids boats lying across pier ends in the North and East Rivers, and makes them responsible for damages inflicted by boats entering or leaving adjacent piers or slips. But, even under this provision of the charter, the responsibility of a boat which maintains itself in an outside position is just that responsibility which is the result of the place in which it is moored. Its distance in or out, as governed by boats lying between it and the pier end, does not enter into the situation. Each boat, beginning with the one on the outside, is responsible for remaining moored off the pier end, to just such an extent as the position in which it is moored violates the statute in question. The parties placing and keeping the boat there are the ones to be held in fault, rather than those who, by some other obstruction, may have furnished the reason or motive for the boats assuming this outside position.

It is evident that the Lohman did not come in contact with the two inside boats. Under the provisions of the statute in question, the two inside boats, viz. the Lehigh Valley and Erie canal boats, were not in such a position as to interfere with the movements of the boat entering or coming out of the adjacent slip. Even if they had no right to lie at the end of the pier, and if their position would interfere with a boat closer to Pier 32 than the Lohman came in swinging out, nevertheless in the present case they did not interfere with the movement of the boat Lohman or of the McAllister, which at no time came in contact with either of these barges. If the Clayton and the Kaaterskill were responsible for being moored in the position in which they were found, then the McAllister must look to them alone, and not to the Lehigh Valley and Erie boats, which did no harm to the McAllister, and which merely show the physical situation leading to the mooring of the Clayton and the Kaaterskill in the place complained of.

Nor does it appear from the testimony that the mooring of the four boats off Pier 33 had anything to do with the injuries for which recovery is sought in this case. These boats and those off Pier 36 went adrift and were rescued, but they had been removed from the situation before Transfer No. 9 undertook to place the Clayton and the Kaat-

erskill ashore, and before the Lohman and the McAllister brought up against the Haines.

[3] The issue, therefore, narrows down to a primary finding that the McAllister was negligent in estimating the space which was available for bringing out the Lohman under the conditions of tide and wind which were present. The captain of the McAllister testifies that he knew that the tide was running so strong that he could not buck the tide with the Lohman, and that he intended to merely drop back, so as to drop her in at the pier to which she was destined. He expected to have room to swing the Lohman clear of the barges which he saw were lying off the end of Pier 32. He was guilty of negligent navigation in undertaking the maneuver in too small a space, or in failing to observe proper precautions, so as to protect himself against the force of the tide. The Lohman and the McAllister apparently drifted back immediately as they rounded the end of Pier 31, and thus diminished the space in which the Lohman could swing out into the river, even though that space was wide enough to allow her to make the turn, if the flood tide had been running with less force.

[4] The next question, therefore, is to determine whether the Clayton and the Kaaterskill, or the New York Central Railroad, should be held responsible for violating the section of the city charter and for in effect blocking a slip, so as to cause damage to a boat coming out while receiving no damage themselves. There has been no case cited, and none is known to the court, holding that the mere presence of a boat off the end of a pier head is of itself negligence, creating responsibility for damage to the other vessel, even if its presence constitutes a violation of the charter (section 879).

The obstruction by a boat in this position renders it responsible for damage to itself; but, if it can be seen, its presence must be taken into account by any other boat, which might be injured, or cause injury to a third vessel, by navigation in disregard of evident conditions. The mooring of the boat and its maintenance in the position prohibited must be accompanied by other circumstances, such as darkness, with no lights shown, or the creation of an obstacle in the water needed for navigation by any craft using proper care in its own movements, before the position off the end of the pier could be held actionable. Wright & Cobb Lighterage Co. v. New England N. Co. (D. C.) 189 Fed. 809; The Chauncey M. Depew, 139 Fed. 236, 71 C. C. A. 362; The Allemania, 231 Fed. 942, 146 C. C. A. 138.

This is illustrated by the presence of the boats off the ends of Piers 33 and 36, which, while in violation of the section of the charter, had nothing to do with the injuries complained of, or the circumstances approximately causing the injury, in the present case. The Clayton and the Kaaterskill, however, were in such position that, according to the testimony of the McAllister, they embarrassed the McAllister in carrying out the maneuver for which there appeared to be, in the opinion of the McAllister's captain, sufficient room. This occurrence was in broad daylight. The space available and the condition of the tide was not only plainly observable, but well known to the captain of the Mc-Allister. No sudden storm or unexpected danger is shown, such as

occurred in the case of Bartley v. Dalzell and Others, and The Vauban, 243 Fed. 216, decided April 26, 1917, in this court.

The landing of the boats off the end of Pier 32, by the New York Central tug, was not of itself negligence, and, in the absence of anything to indicate possible danger, the tug was not compelled to stand by. The Express, 212 Fed. 674, 129 C. C. A. 208. But, further, the piling was not a pier head, and was customarily used as a mooring place. This makes it still more difficult to find that the position of the barges was negligence of itself at the time in question. Section 879 is to be construed strictly, and does not cover a boat hanging on a line. The Allemania, supra.

The piling or rack might be considered a part of the pier head, if the barges were injured by being in that position; but the presence of barges in daylight, alongside a row of piling used for mooring purposes and adjacent to a pier, should certainly not be held to be negligence, so as to make those boats responsible for injuries to a second boat, which was negligently handled by a vessel having in mind and being able to see the entire situation. The act of the boat which originally moved these barges into this position would not make it accountable for the accident which resulted, unless the testimony had indicated that they were being moved while the McAllister was getting the Lohman out.

The libelants should therefore recover against the McAllister in each case, and the petitions of the McAllister, bringing in the various canal boats, should be dismissed, with one bill of costs, to be divided between the New York Central, the Erie, and the owner of the Kaaterskill.

The libel of Haines against the New York, New Haven & Hartford Railroad Company Transfer No. 9 will be dismissed, with costs.

---

⊘⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes